# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2564

_____

United States of America ex rel. Elizabeth D. Holt

*Relator - Appellant*

v.

Medicare Medicaid Advisors, Inc.; Carefree Solutions USA Inc.; Carefree
Insurance Inc.; Aetna Inc.; Humana, Inc.; UnitedHealthcare Insurance Company

*Defendants - Appellees*

------------------------------

United States

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: May 7, 2024
Filed: September 13, 2024

_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

SMITH, Circuit Judge.

Relator Elizabeth Holt (Relator) alleges that Medicare Medicaid Advisors, Inc. (MMA), formerly named Carefree Solutions USA Inc., Carefree Insurance Inc. (Carefree)—a wholly owned subsidiary of Aetna Inc.—and the insurance carriers UnitedHealthcare Insurance Inc. (United), Humana Inc. (Humana), and Aetna Inc. (Aetna), (collectively, the "carriers"), violated the False Claims Act (FCA). The district court[1] dismissed Relator's complaint because it determined that no claims were submitted to the government, specifically the Centers for Medicare and Medicaid Services (CMS); the alleged regulatory violations were not material to CMS's contract with the carriers; and the complaint failed to meet Federal Rule of Civil Procedure 9(b)'s particularity standard. It also dismissed Relator's motion for reconsideration that argued a fraudulent inducement theory and requested leave to amend the complaint. We affirm.

## I. *Background*

Carefree is a full-service field marketing organization that represents insurance companies that offer Medicare Advantage plans. It receives money from insurance carriers to help brokerages, like MMA, sell those plans. The insurance carriers Aetna, Humana, and United sponsor Medicare Advantage plans marketed by MMA. All carriers sold their Medicare Advantage plans through MMA.

In the Medicare Advantage program, participating insurers receive a monthly payment from CMS for each beneficiary enrolled. The monthly payment is determined based on bids that the carriers submit before annual plan enrollment occurs. Each bid contains all estimated revenue required by the plan. In these bids, the carriers factor in commissions paid to brokers like MMA.

Under CMS's regulations, carriers may use brokers to sell their plans. CMS publishes the approved commission limits on its website. When an insurance brokerage, such as MMA, sends a Medicare Advantage enrollment application to an insurance carrier, MMA is paid according to its contracted rate with that carrier. For

___

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

example, assume MMA and Humana have a contracted rate of $100 per valid enrollment application that MMA sends. After MMA sends the application, Humana would then forward that application to CMS for validation. Once validated, CMS would begin paying Humana a predetermined amount every month. CMS's payment to Humana would then be used to cover part, or all, of Humana's $100 payment to MMA. MMA would then use Humana's payment to pay the agent who obtained the application. CMS plays no part in the contract between the carrier and its broker, except for providing the maximum amount a carrier can pay a broker for each application. And CMS pays the same predetermined amount to a carrier regardless of how the carrier obtained the application. Carriers must ensure that their brokers follow the regulations. Among many other requirements, the regulations provide marketing rules and require agents to be licensed.

Medicare Advantage plans are given star ratings from a low of 1 star to a high of 5 stars. Those ratings provide beneficiaries information on plan performance, assist CMS in identifying low-performing plans, and serve as factors in a bonus payment program. Medicare Advantage plan star ratings derive from many data sources.

CMS can sanction carriers when they violate the regulations. Sanctions may include suspending future plan enrollment; suspending payment for beneficiaries who are enrolled after notice; suspending communications (including marketing activity); and imposing monetary penalties. 42 C.F.R. § 422.750(a).

Relator worked as an insurance agent for MMA from September 2015 through December 2016. She marketed and sold Medicare Advantage plans. Relator alleges that since MMA's inception in 2006, MMA has engaged in a systematic, company-directed fraud scheme. The alleged scheme involved falsification of CMS-mandated agent certifications and widespread violations of Medicare Advantage marketing regulations.

In September 2017, Relator sent a letter to the carriers advising them of MMA's unlawful marketing practices. In February 2018, she sent a second letter to the carriers and the Missouri Department of Insurance outlining MMA's illegal conduct. Relator filed suit after not receiving satisfactory responses to her letters. Her second amended complaint contains six counts, all alleging violations of the FCA.[2]

MMA is named in Counts I, IV, and V. The district court grouped MMA's alleged misconduct into three scheme categories.

The first scheme category involved marketing practices. Under this alleged scheme, MMA's sales of Medicare Advantage plans violated federal sale and marketing regulations. The alleged unlawful business practices included the following: (1) cold-calling and door-to-door sales of Medicare Advantage plans; (2) using false lead sheets to prompt or justify a sales call; (3) making misrepresentations to beneficiaries; (4) using the White Pages mobile application to find Medicare-aged individuals in the same area of other leads; (5) "churning," or encouraging beneficiaries to switch plans to generate commissions; (6) "pushing" beneficiaries to Medicare Advantage plans preferred by MMA; (7) enrolling beneficiaries outside of the Annual Enrollment Period; and (8) enrolling individuals in the federally subsidized Extra Help program without checking that enrollees met the income limits.

The next scheme involved agent certification. Allegedly, MMA falsely attested that its agents were fully certified to sell Medicare Advantage plans when MMA knew its agents were not. The purpose of the scheme was to illegally obtain sales commissions from the Medicare Advantage program. Thus, all the Medicare Advantage plans submitted by MMA's agents to the carriers were false claims.

---

[2]Although Relator's complaint references the Anti-Kickback Statute, she only brings causes of action under the FCA.

Lastly, the complaint alleged a star-rating scheme. In this alleged scheme, MMA instituted a system to bypass a complaint-tracking module that enables carriers and CMS to track the number and type of complaints received about Medicare Advantage plans. This scheme allegedly improved the star rating of each Medicare Advantage plan and entitled the carriers to financial incentives, including bonus payments. The scheme consisted of the use of marketing materials—such as refrigerator magnets—and directives to encourage beneficiaries to call MMA, not the carriers or CMS, with any problems regarding their plan. This scheme also allegedly lowered the number of complaints CMS received about the carriers.

Carefree is named in Count II, and Relator asserts two theories of liability. First, Carefree violated the FCA by funding MMA's expansion despite knowing that MMA was engaged in the agent-certification and marketing schemes. Second, Carefree and MMA entered into an agreement where Carefree funded MMA's expansion and paid bonuses to MMA in exchange for MMA agents pushing Aetna plans.

The carriers are named in Counts III and VI. Count III alleges that after Relator's September 2017 letter, the carriers violated the FCA by continuing to submit applications for Medicare Advantage plans sold by MMA and pay commissions to MMA for those applications. Count VI alleges that the carriers violated the FCA by submitting applications to CMS and paying MMA's commissions after Relator informed the carriers about MMA's star-rating scheme.

The defendants moved to dismiss Relator's claims, and the district court granted the motion. The district court held that (1) Relator's claims were not pleaded with sufficient particularity under Rule 9(b); (2) Relator's claims were not material to CMS's contract with the carriers; and (3) neither MMA nor the carriers submitted claims—as defined by the FCA—to CMS for payment.

Relator filed a motion for reconsideration that the district court denied. "Relator ask[ed] the [c]ourt to consider an alleged 'fraudulent inducement theory'

she contends was included in the [c]omplaint, but which Defendants ignored in their motions to dismiss . . . ." *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, No. 18-cv-00860-DGK, 2023 WL 3807046, at *1 (W.D. Mo. June 2, 2023). The court pointed out that although "Relator contends the [c]omplaint set forth a fraudulent inducement theory of liability, . . . she does not identify any particular part of the [c]omplaint which sets forth such an allegation." *Id.* at *2. Because "the [c]omplaint simply contain[ed] no fraudulent inducement claim" and "Relator's briefing on her motion to reconsider cite[d] almost exclusively to her opposition briefs and barely to the [c]omplaint," the district court denied Relator's motion to reconsider. *Id.* In her motion for reconsideration, Relator also requested leave to amend her complaint to include a fraudulent inducement claim. The district court denied Relator's request because "amend[ing] the Complaint to add a fraudulent inducement claim [] would be futile. The Court's holdings on materiality . . . and presentment . . . made in its rulings on the motions to dismiss would be just as fatal to any fraudulent inducement claim." *Id.*

## II. *Discussion*

Relator appeals the district court's order granting the carriers' motion to dismiss and denying her motion for reconsideration.

### A. *Motion to Dismiss*

"We review *de novo* the district court's order granting the motion to dismiss, accepting the allegations contained in the complaint as true and drawing all reasonable inferences in the relator['s] favor." *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1188 (8th Cir. 2010). Because this is an FCA allegation, Relator's complaint would need to survive Rule 9(b)'s heightened pleading standard for fraud. Under Rule 9(b), Relator's FCA complaint "must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916–17 (8th Cir. 2014) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d

552, 556 (8th Cir. 2006)). After carefully reviewing the record, we hold that Count II's allegations fail to meet Rule 9(b)'s particularity requirement. *See id.*

### 1. *Presentment*

Relator argues that MMA knowingly caused false claims to be presented to CMS, and the carriers knowingly presented those false claims.

Title 31 U.S.C. § 3729 governs Relator's claims. Section 3729(a)(1)(A) imposes liability when one "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." The FCA defines the word "claim." The Act states:

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation

for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property . . . .

31 U.S.C. § 3729(b)(2).

Based on these provisions, when an FCA case involves money demanded from a recipient of federal funds, for there to be a claim under § 3729(b)(2) the plaintiff must show that five elements are satisfied. Those elements are: (1) a "request or demand"; (2) "made to a contractor, grantee, or other recipient" of money or property "the United States Government . . . provided"; (3) "the United States Government . . . provided any portion of the money or property requested or demanded," or if the requestee pays the requestor before the government issues payment to the requestee, "the United States Government . . . will reimburse . . . any portion of the money or property which" the requestee pays the requestor; (4) the payment given to the requestor will "be spent or used on the Government's behalf or to advance a Government program or interest"; and (5) the request does not violate 31 U.S.C. § 3729(b)(2)(B). *Id.* If the money is requested from a federal government officer, employee, or agent, then the plaintiff must satisfy three elements. Those elements are: (1) a "request or demand . . . for money or property" that is; (2) "presented to an officer, employee, or agent of the United States"; and (3) the request does not violate § 3729(b)(2)(B). *Id.* These elements must be pleaded with the requisite particularity. *See* Fed. R. Civ. P. 9(b).

For analytical purposes, we will assume without deciding that the defendants presented claims under the FCA.

### 2. *Materiality*

"[A]n FCA plaintiff must prove that the 'defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim.'" *United States v. Hawley*, 619 F.3d 886, 895 (8th Cir. 2010) (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008)); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176,

192 (2016) ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision . . . .").[3]

The Supreme Court broadly discussed materiality in *Escobar*. "Section 3729(b)(4) defines materiality using language that [the Court has] employed to define materiality in other federal fraud statutes: '[T]he term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Escobar*, 579 U.S. at 192–93 (second alteration in original) (quoting 31 U.S.C. § 3729(b)(4)). "[M]ateriality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (second alteration in original) (internal quotation marks omitted). Additionally,

> [t]he materiality standard is demanding. The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial. . . .

---

[3]The text of § 3729(a)(1)(A) does not explicitly impose a materiality requirement. *See* 31 U.S.C. § 3729(a)(1)(A) (imposing liability on a party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). The Supreme Court read in a materiality requirement in *Escobar*. 579 U.S. at 181, 192–96. Because Congress did not define "false or fraudulent" in the FCA, the Court held that "absent other indication, Congress intend[ed] to incorporate the well-settled meaning of the common-law terms it use[d]." *Id.* at 187 (internal quotation marks omitted). Because the common-law definition of a false or fraudulent statement includes a materiality requirement, so too does the "false or fraudulent" language in § 3729(a)(1)(A). *See United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 200–01 (4th Cir. 2022); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 105–06 (2d Cir. 2021); *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 n.8 (10th Cir. 2020).

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 194–95 (internal quotation marks and citation omitted).

Over time, our sister circuits have whittled down *Escobar*'s materiality discussion into three non-exhaustive factors; we adopt those factors. Materiality, therefore,

> turns on a variety of [non-exhaustive] factors such as: (1) whether the government has expressly designated the legal requirement at issue as a condition of payment; (2) whether the alleged violation is minor or insubstantial or instead goes to the essence of the bargain between the contractor and the government; and (3) whether the government made continued payments, or does so in the mine run of cases, despite actual knowledge of the violation.

*United States ex rel. Druding v. Care Alts.*, 81 F.4th 361, 367 (3d Cir. 2023) (internal quotation marks omitted); *see also United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (listing the same factors). No one factor is dispositive, and this is a holistic inquiry.[4]

---

[4]These factors do not conflict with our decision in *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494 (8th Cir. 2016). In *Miller*, we said that "[a] false statement or record is 'material' for FCA purposes if either (1) a reasonable

Regarding the third factor, the United States, as amicus curiae, argues that a relator's inability to present examples of past government action when the government learned of regulatory violations should not negatively impact a relator's claim. We agree.[5] The absence of examples neither weakens nor strengthens a claim. A relator's inability to present examples of government action post-discovery indicates that the third *Escobar* factor is neutral.

The materiality factors do not include whether the government intervened in a relator's case. We hold that the government's decision not to intervene in a relator's case is of minimal significance when determining whether an alleged violation is material. *See Brookdale Senior Living*, 892 F.3d at 836.

---

person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." *Id.* at 503. One indication that a reasonable person would attach importance to a false statement is "whether the alleged violation is minor or insubstantial or instead goes to the essence of the bargain." *Care Alts.*, 81 F.4th at 367 (internal quotation marks omitted). Next, "whether the government has expressly designated the legal requirement at issue as a 'condition of payment,'" *id.*, and "whether the government made continued payments . . . in the 'mine run of cases,' despite 'actual knowledge' of the violation," *id.*, indicates "that the government would attach importance to [the false statement]," *Miller*, 840 F.3d at 503. These non-exhaustive factors refine rather than conflict with *Miller*.

[5]*See United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019) ("The Sixth Circuit held that *Escobar* does not require the relator to allege in the complaint specific prior government actions prosecuting similar claims. The Sixth Circuit reasoned: 'The Supreme Court was explicit that none of the factors it enumerated were dispositive. Thus, it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive.' Indeed, the Government's legal investigations are often conducted in secrecy; we do not expect [a relator] to know precisely the Government's prosecutorial practices without the benefit of discovery." (footnotes omitted) (quoting *Brookdale Senior Living*, 892 F.3d at 834)).

If MMA's alleged violations are immaterial, then it follows that the carriers' alleged failure to oversee MMA's adherence to those regulations is also immaterial. Thus, our analysis will focus on the materiality of MMA's alleged violations. We will address each of the identified scheme categories.

### a. *Marketing Scheme*

The first *Escobar* factor, condition of payment, does not favor a finding of materiality for the marketing scheme allegations. The regulations do not expressly state, as a condition of payment, that a carrier or their agent must follow the Medicare marketing regulations to receive payment. This case is not like *Care Alternatives* because in that case, adherence to a Medicare regulation was necessary for payment. 81 F.4th at 369–70 ("[H]ospice providers may not bill CMS for their services without clinical information and other documentation that support the medical prognosis accompanying the certification and filed in the medical record." (cleaned up) (citing 42 C.F.R. § 418.22(b))).

Relator argues that because the carriers "certify that they will follow the rules to participate in the program," this factor falls in their favor. Appellant's Br. at 45; *see also* 42 C.F.R. § 422.504(h)(1) (explaining that carriers must comply with federal laws and regulations). But general statements that an entity must comply with applicable regulations are insufficient to satisfy this factor. *See Care Alts.*, 81 F.4th at 369–70; *see also Brookdale Senior Living*, 892 F.3d at 831–33. Because no regulation expressly conditions payment on compliance with marketing regulations, the first factor goes against materiality.

Second, MMA's alleged failure to follow marketing regulations does not go to the "essence" of CMS's contract with the carriers. When a carrier fails to comply with the marketing requirements, "CMS *may* impose one or more of the sanctions" outlined in the regulations. 42 C.F.R. § 422.752(a) (emphasis added). The regulations do not direct CMS to sanction a carrier because the carrier's agent commits marketing violations. CMS's discretionary authority to sanction carriers for

marketing violations disfavors treating such violations as going to the essence of CMS's contract with the carriers.

The regulations also indicate that some marketing and oversight violations are minor. CMS can terminate a carrier's contract if the carrier substantially fails to ensure that its broker follows marketing regulations. 42 C.F.R. § 422.510(a)(4)(viii) (stating that CMS can terminate its contract with a carrier if the carrier "[s]ubstantially fails to comply with the [marketing and oversight] requirements"). The use of the word "substantial" indicates that there are insubstantial—or garden-variety—violations of marketing and oversight regulations that will not support a decision to terminate a carrier's contract. The fact that there can be insubstantial violations of the regulations at issue indicates that these regulations do not go to the essence of CMS's contract.

Finally, none of the alleged violations harmed the purpose of CMS's contract. Medicare programs, like Medicare Advantage, provide health insurance to millions of Americans. Regulatory violations that go to the essence of Medicare's programs would have to impact CMS's or the carriers' ability to provide healthcare services to those who qualify. Marketing violations, like those alleged here, likely do not hinder CMS's or a carrier's ability to provide those medical services. The second *Escobar* factor weighs against materiality.

The third factor is neutral. The record simply does not contain sufficient evidence of how CMS responds when it has actual knowledge of marketing violations.

Under the *Escobar* factors, we hold that MMA's alleged violation of marketing regulations is not material to CMS's agreement with the carriers.

b. *Agent-Certification Scheme*

Does the condition-of-payment factor favor materiality? There are two ways we could view this factor. One view is whether there is a condition of payment

applicable to CMS's payment to a carrier. In other words, is CMS's payment to a carrier conditioned on a rule requiring that a carrier's broker use certified agents? The second view is whether there is a regulation that prevents the carrier from using the money it received from CMS to pay a broker who uses an uncertified agent. The first view focuses on CMS, and the second view focuses on the carrier.

Under the first view, the condition-of-payment factor does not support materiality. We are unaware of a rule that prevents CMS from paying a carrier because that carrier used a broker who relied on an uncertified agent to complete an application.

If we analyze this factor under the second view, however, the condition-of-payment factor favors materiality. Carriers can only pay "agents or brokers" who meet the certification requirements. 42 C.F.R. § 422.2274(d)(1)(i). The regulation reads, "[Carriers] may only pay agents or brokers who meet the requirements in paragraph (b) of this section." *Id.* For instance, paragraph b requires that "[a]gents and brokers who represent [carriers] must . . . . [b]e licensed and appointed under State law (if required under applicable State law)." *Id.* § 422.2274(b)(1). Because "compliance with a particular . . . regulatory . . . requirement [i]s a condition of payment," the first factor favors materiality under the second view. *Escobar*, 579 U.S. at 194.[6]

We will not decide which view is best. Even if we assumed that this factor favors materiality, our ultimate holding regarding the alleged agent-certification scheme would remain unchanged. Therefore, whether the condition-of-payment factor focuses on a direct or indirect recipient of government funds, here a carrier or MMA, is of little significance to this issue's resolution.

---

[6]The 2021 version of 42 C.F.R. § 422.2274 was the first to include the "may only pay" language. Here, however, any differences between yearly regulations do not change our holding. Even if the first factor favors Relator, as it does here, the agent-certification scheme is still immaterial.

The essence-of-the-bargain factor goes against materiality. If an agent is uncertified, CMS still pays the carrier because it is the *carrier's* job to withhold payment to a broker who uses the agent. *See* 42 C.F.R. § 422.2274(d)(1)(i). In this situation, "the Government [would likely pay the] particular claim in full despite its actual knowledge that certain requirements were violated." *Escobar*, 579 U.S. at 195. Thus, the alleged agent certification scheme is a minor or insubstantial violation that does not go to the essence of CMS's contract.

The continued-payments factor is neutral. The record does not show what CMS has done when it has actual knowledge of violations like MMA's alleged agent-certification scheme. Although we can infer, based on the regulations, that CMS would pay the claim, that is only a rational *inference*, not evidence.

We conclude that the agent-certification scheme is immaterial under the FCA.

### c. *Star-Rating Scheme*

Lastly, the alleged star-rating scheme is also immaterial to CMS's payout decision. First, we are unaware of a regulation conditioning CMS's payment to the carriers based on the carriers' compliance with star-rating regulations. The first factor disfavors materiality. Second, MMA's alleged violation of the star-rating system does not go to the essence of CMS's decision to contract with a carrier. As discussed, violations that impact CMS's or a carrier's ability to provide healthcare services would likely be material. The star-rating system, although important, does not go to the essence of CMS's contract with a carrier. Third, as with the other alleged schemes, there is no evidence about CMS's past conduct when it knew of violations like MMA's alleged star-rating scheme. We conclude that the alleged star-rating scheme is immaterial.

Because none of MMA's alleged schemes are material to CMS's bargain with the carriers, we conclude that the carriers' alleged failure to oversee MMA's adherence to the relevant Medicare regulations is immaterial. Relator's false-claim allegations do not "address[] a foundational part of the Government's" Medicare

-15-

Advantage program. *Care Alts.*, 81 F.4th at 371 (quoting *United States v. Luce*, 873 F.3d 999, 1007 (7th Cir. 2017)). Thus, we affirm the district court's dismissal of Relator's complaint.

### B. *Motion for Reconsideration*

Finally, did the district court correctly deny Relator's motion for reconsideration? The motion, for the first time, argued a fraudulent inducement theory and requested leave to amend the complaint. The district court denied the motion because the complaint did not contain a fraudulent inducement claim and amending the complaint to include that claim would be futile.

"We review the district court's denial of a motion to reconsider for abuse of discretion." *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 391 F.3d 907, 911 (8th Cir. 2004). "A motion for reconsideration is not described in the Federal Rules of Civil Procedure, but such a motion is typically construed either as a Rule 59(e) motion to alter or amend the judgment or as a Rule 60(b) motion for relief from judgment." *Auto Servs. Co. v. KPMG, LLP*, 537 F.3d 853, 855 (8th Cir. 2008) (internal quotation marks omitted). "[T]he customary Rule 59(e) standard . . . bars attempts to introduce new evidence, *tender new legal theories*, or raise arguments which could have been offered or raised prior to entry of judgment, and Rule 60(b)(1) . . . limits relief to showings of mistake, inadvertence, surprise, or excusable neglect . . . ." *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 823 (8th Cir. 2009) (emphasis added) (internal quotation marks and citation omitted).

The district court was within its discretion to deny Relator's motion for reconsideration. Relator argued a fraudulent inducement theory in her motion for reconsideration, but that motion is not the proper place to "tender new legal theories." *Hypoguard USA*, 559 F.3d at 823 (internal quotation marks omitted). Relator has twice amended her complaint, and neither time did she amend the complaint to include a fraudulent inducement claim. Her attempt to read in such a claim after the district court dismissed her complaint fails.

Did the district court err when it denied Relator's third request for leave to amend her complaint? "[I]nterests of finality dictate that leave to amend should be less freely available after a final order has been entered. . . . [A]lthough leave to amend a complaint should be granted liberally when the motion is made pretrial, different considerations apply to motions filed after dismissal." *Id.* (internal quotation marks omitted). "A district court may appropriately deny leave to amend where there are compelling reasons such as . . . repeated failure to cure deficiencies by amendments previously allowed . . . or futility of the amendment." *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (internal quotation marks omitted). "Denial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (internal quotation marks omitted).

The court appropriately denied Relator's request to amend her complaint. Relator made her third request for leave to amend her complaint in her motion for reconsideration. The district court denied leave to amend because the inclusion of a fraudulent inducement claim would have been futile. *Holt*, 2023 WL 3807046, at *2 ("The [c]ourt's holdings on materiality . . . and presentment . . . would be just as fatal to any fraudulent inducement claim . . . ."). Even if we gave Relator leave to allege a fraudulent inducement claim, she has not indicated how that claim would survive a materiality analysis. Because the alleged violations are immaterial to CMS's contracts with the carriers, repleading the complaint with a fraudulent inducement claim would not survive another motion to dismiss.

### III. *Conclusion*

Accordingly, we affirm the district court.

_____

-17-