# Supreme Court of Texas

No. 25-0127

Laboratory Corporation of America Holdings d/b/a Laboratory Corporation of America,

*Petitioner*,

v.

The State of Texas and NPT Associates,

*Respondents*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued February 12, 2026**

JUSTICE HAWKINS delivered the opinion of the Court, in which Justice Lehrmann, Justice Devine, Justice Bland, Justice Huddle, Justice Young, and Justice Sullivan joined.

CHIEF JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Busby joined.

JUSTICE BUSBY filed a dissenting opinion.

The State asserts that LabCorp—a laboratory testing services company and Texas Medicaid participant—violated Texas administrative regulations by failing to offer the Medicaid program the

same pricing and discounts that it offered other payors. According to the State, LabCorp made false statements, misrepresentations, and omissions regarding its compliance with these regulations. Invoking what once was called the Texas Medicaid Fraud Prevention Act (and today is called the Texas Health Care Program Fraud Prevention Act), the State now seeks to impose civil penalties on LabCorp in connection with transactions reaching back over twenty years.

This dispute requires us to decide whether the relevant provision of the Act forbids *all* omissions, or only those that actually *matter* to the government's payment decision. Put differently, does the Act require the government (or *qui tam* relator) to show materiality in order to impose liability for an omission?

We hold yes. In banning fraud against the State, the Act taps into a deep set of background common-law principles that have always required a showing of materiality in order to render a falsehood or omission actionable. Our Legislature was well familiar with that historical pedigree, and nothing in the statutory text indicates a desire to depart from the traditional understanding of fraud.

We further find no materiality in this record. LabCorp opened its books, records, and practices to the State in 2014. Through a series of document productions, presentations, and other communications, LabCorp demonstrated the ambiguities in the relevant administrative regulations and explained its position on their proper interpretation. For seven years thereafter, through 2021, the State paid each of LabCorp's claims without a word of objection. The State never withheld payment, never lodged any protest, and never advised LabCorp that its

2

interpretation of these regulations was incorrect. No documents—no internal analyses, no external communications—suggest that any alleged regulatory violation had any bearing on the millions of dollars the State paid LabCorp for countless medical services to indigent patients over the course of many years.

This record is incompatible with materiality. The trial court therefore correctly awarded LabCorp summary judgment. We reinstate that judgment and reverse the contrary judgment of the court of appeals.

## I

We begin by unfurling the complex administrative labyrinth out of which the State's fraud claim arises.

## A

### 1

The Medicaid program was created in 1965 "to subsidize state efforts to provide healthcare to families and individuals 'whose income and resources are insufficient to meet the costs of necessary medical services.'" *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 363 (2025) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015)). Unfortunately, since its inception, Texas's Medicaid program has experienced "fraud, abuse, and waste" that "divert funds that could otherwise be used to provide essential health-care services." *In re Xerox Corp.*, 555 S.W.3d 518, 524 (Tex. 2018). In 1995, the Texas Legislature passed the Texas Medicaid Fraud Prevention Act to serve as a "powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity." *Id.* at 525; *see generally* Act of May 26, 1995, 74th Leg., R.S., ch. 824, 1995 Tex. Gen. Laws 4202-

3

08 (current version at Tᴇx. Hᴜᴍ. Rᴇs. Cᴏᴅᴇ §§ 36.001-.132). The Act provides that "a person who commits an unlawful act is liable to the state for" potentially vast civil penalties. Tᴇx. Hᴜᴍ. Rᴇs. Cᴏᴅᴇ § 36.052(a). In addition to authorizing enforcement by state officials, the Act deputizes private citizens, known as *qui tam* relators, to "bring a civil action for a violation of Section 36.002 for the person and for the state." *Id.* § 36.101(a).[1]

Section 36.002 lists unlawful acts. *Id.* § 36.002. Relevant here, the statute prohibits false statements, misrepresentations, and omissions that permit an unauthorized benefit or payment. As the statute says:

> A person commits an unlawful act if the person:
>
> (1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> . . .
>
> (4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: . . . (B) information required to be provided by a federal or

---

[1] The Act was amended in 2023 to include two additional healthcare programs. It is now referred to as the Texas Health Care Program Fraud Prevention Act. *See* Act of May 16, 2023, 88th Leg., R.S., ch. 273, §§ 2-12, 2023 Tex. Gen. Laws 584, 584-88. For simplicity, we refer to the statute as "the Act."

state law, rule, regulation, or provider agreement pertaining to a health care program . . . .

*Id.* § 36.002(1), (2), (4)(B).

**2**

Through its administrative agencies, the State has promulgated a forest of regulations governing the Medicaid program and the healthcare providers with whom it partners. We now chart the ones that give rise to this dispute.

First there is the Texas Administrative Code. Chapter 371 concerns "Medicaid and Other Health and Human Services Fraud and Abuse Program Integrity." *See* 1 TEX. ADMIN. CODE §§ 371.1-.1723. One of its provisions regulates the invoicing and pricing of services by invoking "usual and customary" fees:

> A person is subject to administrative actions or sanctions if the person submits, or causes to be submitted, a claim for payment by the Medicaid or other HHS program: . . . (9) for an item or service where the charges for that item or service exceed the usual and customary fee the person charges to the public, privately insured persons, or private-pay persons for the same item or service . . . .

*Id.* § 371.1653(9).

Immediately after that provision comes one governing "charges or costs" that were "discounted" for certain other payors:

> A person is subject to administrative actions or sanctions if the person submits, or causes to be submitted, a claim for payment by the Medicaid or other HHS program: . . . (10) for an item or service where the charges or costs for that item or service were discounted for the public, privately insured persons, or private-pay persons for the same item or service . . . .

*Id.* § 371.1653(10).

Chapter 371 includes a "Definitions" section that defines some 96 terms ranging from "Abuse" to "Waste." *Id.* § 371.1. Some of the terms in the above provisions are defined, including "claim," "[d]elivery of a health care item or service," "person," and "sanction." *Id.* But Chapter 371 defines neither "discounted" nor "usual and customary fee."

On top of those administrative provisions, Medicaid providers are subject to two additional sets of regulations found in program-specific documents. One is the Texas Health and Human Services Commission Medicaid Provider Agreement. Among its several dozen requirements is a "Nondiscrimination" clause, under which providers agree "to grant Medicaid recipients all discounts and promotional offers provided to the general public." That clause further provides that:

> Provider agrees and understands that free services to the general public must not be billed to the Medicaid program for Medicaid recipients and discounted services to the general public must not be billed to Medicaid for a Medicaid recipient as a full price, but rather the Provider agrees to bill only the discounted amount that would be billed to the general public.

The Agreement explains that "falsifying entries, concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law." In signing the Agreement, providers agree to comply with Title I, Part 15, Chapter 371 of the Texas Administrative Code.

Still more requirements are set out in the Texas Medicaid Provider and Procedures Manual, to which all Texas Medicaid providers must consent as a condition for participation in the program. The

6

Manual contains similar, but not identical, requirements to those found in the Provider Agreement:

> After submitting a signed claim . . . , the provider certifies [that]:
>
> . . .
>
> - All billed charges are usual and customary for the services provided. . . .
> - The provider will not bill the [Texas] Medicaid program for services that are provided or offered to non-Medicaid patients, without charge, discounted or reduced in any fashion including, but not limited to, sliding scales or advertised specials. Any reduced, discounted, free, or special fee advertised to the public also must be offered to [Texas] Medicaid clients.

As this language shows, the Manual twice ties "discounted" fees to advertising.

**B**

Petitioner Laboratory Corporation of America Holdings provides a variety of lab testing services to the general public nationwide, including to Texas Medicaid enrollees. As a participant in the Texas Medicaid program, LabCorp is required to comply with all of the authorities discussed above, including the Act, Chapter 371 of the Administrative Code, the Agreement, and the Manual.

In 2013, NPT Associates sued LabCorp under the Act's *qui tam* provisions. That filing prompted the Office of the Attorney General of Texas to investigate LabCorp's billing practices. In 2013, OAG served a civil investigative demand (called CID for short) on LabCorp seeking information on the alleged fraudulent conduct NPT Associates identified. *See* TEX. HUM. RES. CODE § 36.053(a), (b)(3) (conferring OAG's investigative authority). This CID is not included in the record before

7

our Court, but the parties agree that it directed LabCorp to provide OAG extensive information about its billing practices.[2]

In response, LabCorp submitted to OAG three principal categories of information that will be relevant today. We will review LabCorp's disclosures in some detail over the next few pages, but the important takeaway is that these materials put the State on notice in 2014 of the following: LabCorp has a two-tier pricing structure; LabCorp bills all third-party payors (private insurance companies, managed-care companies, and government payors, including Medicaid) the same Patient Fee Schedule rate; LabCorp accepts lower payments from private insurers through negotiated arrangements; and LabCorp does not consider these arrangements to be "discounts" within the meaning of the billing regulations because the State's own guidance suggests the "discount" rules are focused only on "advertised" and "promotional" rates available to "the general public."

First came LabCorp's records production. Within a year of receiving the 2013 CID, LabCorp turned over some 250,000 pages of

---

[2] Neither the 2013 CID nor a subsequent 2018 CID, which is discussed further below, is in the record before us. The record contains certain documents produced in response to the CIDs—such as internal LabCorp communications and documents—as well as letters and discovery requests referencing the CIDs. A reviewing court would be better positioned to understand these materials if it could review for itself the CID language that prompted their submission. As we recently emphasized, "[p]arties should . . . ensure that materials they themselves recognize as essential to their dispute are included in the record so that appellate courts can more readily perform their function of reviewing trial-court judgments." *MV Transp., Inc. v. GDS Transp., LLC*, ___ S.W.3d ___, 2026 WL 1261443, at *2 (Tex. May 8, 2026).

documents, including nearly seven years of billing data reflecting specific tests performed, how other payors were billed for those tests, and what those payors ultimately paid. The records also included related communications, electronically stored information, and compliance materials.

Then, in 2014, LabCorp met in person with OAG decisionmakers, including the then-Deputy Chief of OAG's Civil Medicaid Fraud Division. In that meeting, LabCorp presented the details of its billing practices and discussed how they fit with the State's billing regulations. Afterwards, LabCorp provided OAG with a slide-deck summary. The slide deck highlights LabCorp's efforts to cooperate with the State's 2013 CID and its compliance practices generally, and it summarizes in detail LabCorp's relevant billing practices.

There is no transcription of what was said at this in-person meeting, but all sides agree that the slide deck is a fair encapsulation of the discussion. First is a slide setting out "Charging and Billing Processes." The slides highlighted that Medicaid is one of several payors with whom LabCorp partners, along with hospitals, clinics, doctors, patients, managed-care companies, and Medicare. LabCorp explained that these payors are billed according to different practices. Within the category of third-party payors, there are two billing arrangements: "fee-for-service" and "capitated agreements." The former are billed according to a patient fee schedule, which is "negotiat[ed] by physicians on behalf of their patients." The slide added that "Medicaid billings are based on government-set fee schedules and reimbursement rules." By contrast, capitated agreements "are billed 'based on a negotiated

9

monthly contractual rate.'" A later slide clarified that LabCorp applies its "Usual & Customary" charge to all payors on the Patient Fee Schedule, including Medicaid.

The slide deck then explained that "[l]ike most health care providers, LabCorp distinguishes between <u>charges</u> and <u>payments</u>." (Emphases in original.). LabCorp elaborated that on the front end, it "charges patients and all third-party payors the amounts set forth in the Patient Fee Schedule." But on the back end, it "may accept from some third-party payors amounts based on" multiple factors, including privately negotiated rates and "fee schedules set by Medicare or Medicaid." In other words, when a privately insured patient receives lab services, LabCorp *bills* the insurer the full Patient Fee Schedule rate, but LabCorp may *accept* a lower payment on that bill depending on different considerations, including private contractual obligations. Outside those scenarios, "LabCorp expects patients and their insurers to pay the charges set forth in the Patient Fee Schedule."

A few months later, in 2015, LabCorp prepared and submitted a supplemental "white paper" to "outline[] LabCorp's billing practices and how those industry-standard practices comply with Texas Medicaid's billing requirements." The white paper reiterated, consistent with the slide deck, that there are situations in which LabCorp accepts payment reductions from non-Medicaid payors. It explained:

> LabCorp does sometimes agree to accept payments lower than its usual and customary charge from certain third-party payors. But Texas law does not require a provider to *charge* Texas Medicaid what the provider sometimes *accepts as payment* from others. Texas law requires a "usual and customary *charge*," and a "charge"

10

and a "payment" are not the same thing. A "charge" is what a provider bills, while a "payment" is what the provider is ultimately paid.

(Emphases in original.). It further elaborated on how LabCorp's two fee schedules create differential pricing. In particular, clients (including hospitals, clinics, and doctors) are billed the Client List Price, while third-party payors, including Medicaid, get billed the same Patient Fee Schedule.

The white paper expressly acknowledged Texas's administrative regulations regarding usual-and-customary charges, best pricing, and discounts, but explained why LabCorp believed its practices comply fully with each. LabCorp noted, "Texas law also requires that independent laboratories like LabCorp offer to Texas Medicaid any discounted prices that were advertised to the public or billed to the general public." However, "LabCorp neither advertises discounts to the public nor bills discounted prices to the general public." In this situation, "Texas law requires only that LabCorp bill its 'usual and customary' charge to Texas Medicaid." That view draws support from the Manual, which (as discussed above) twice describes the "discount" requirement in connection with advertising and mandates that "[a]ny reduced, discounted, free, or special fee advertised to the public also must be offered to [Texas] Medicaid clients." Similarly, the Provider Agreement prohibits LabCorp from providing discounts or free services to the "general public." To be sure, the white paper acknowledged that the "discount requirement is not a model of clarity." But LabCorp maintained that the regulations are "focused only [on] discounted prices that are advertised to the public or billed to the general public. With no

such discounts, LabCorp correctly bills its usual and customary charge to Texas Medicaid."

In 2018—three years after receiving the white paper and four years after receiving extensive documentation responsive to the first CID—the State issued a second CID. LabCorp again provided ample documentation, and by 2019, it had produced over 800,000 pages of documents. Among the documents produced in response to the second CID were agreements between LabCorp and private health-insurance companies, updated pricing policies, internal email exchanges regarding pricing policies, and various fee schedules.

## C

### 1

At no point after receiving the extensive documentation and information laid out above did the State express any objection regarding the lawfulness of LabCorp's billing practices. The State never expressed disapproval of LabCorp's understanding of the regulations. It never corrected LabCorp's approach to billing or pricing, or its view of the term "discounted." It never disputed LabCorp's position, grounded in the Manual and Provider Agreement, that the "discount" requirement is best understood as applying only to "advertised" and "promotional" front-end pricing for "the general public," not back-end negotiated payment reductions for certain payors. The State never pushed back on LabCorp's billing structure that separates payors into categories. It never contested LabCorp's practice, like that of "most health care providers," which "distinguishes between <u>charges</u> and <u>payments</u>." (Emphases in original.). The record contains no documents—internal or

12

external—doubting LabCorp's compliance with the law, suggesting that LabCorp's certifications were improper, or suspecting LabCorp omitted material information.

Instead, the State continued to pay LabCorp's claims uninterrupted, over the course of seven years, in amounts reaching millions of dollars.

**2**

That changed in early 2021, when the State concluded that LabCorp had been violating the billing regulations since 2005.

In January 2021, the State intervened in the pending NPT Associates action and filed the operative petition. The State alleges that LabCorp violated Texas's administrative regulations, as set out above, when it submitted reimbursement claims to Texas Medicaid at higher rates than it was entitled to charge. Specifically, LabCorp allegedly failed to offer to Texas Medicaid "discounts" that it had offered to non-Medicaid payors, including Humana, Cigna, and United HealthCare, for the same services. LabCorp further provided "across-the-board" and "special price" discounts to certain health care providers. "As a result of LabCorp's conduct," the State alleges, "the State reimbursed LabCorp millions of dollars more for lab testing services than it should have."

According to the State, LabCorp's repeated certifications that it complied with Texas law on reimbursement claims and more than one hundred Provider Agreements—as well as its failure to disclose its unlawful conduct—constituted false statements, misrepresentations, and omissions in violation of the Act. *See* TEX. HUM. RES. CODE

§ 36.002(1), (2), (4)(B). Specifically, the State asserts that LabCorp made false statements or misrepresentations on reimbursement claims and Provider Agreements in violation of Sections 36.002(1) and 36.002(4)(B), and concealed or failed to disclose that it was not in compliance with Texas laws and regulations in violation of Section 36.002(2). *Id.* LabCorp's conduct thereby permitted it to receive reimbursements to which it was not entitled.[3]

LabCorp filed a traditional motion for partial summary judgment, arguing the State failed to establish the materiality of the allegedly unlawful acts. According to LabCorp, any false statements, misrepresentations, or omissions were not material because they had no impact at all on the State's payment decisions. The State knew of LabCorp's billing practices—specifically, its alleged failure to provide discounts to Texas Medicaid—yet routinely paid each claim without objection for seven years. The trial court granted the motion, denied the State's motion for reconsideration, and, after the remaining claims were nonsuited, rendered judgment for LabCorp. The court of appeals reversed and remanded, holding that (1) Section 36.002(2), the Act's omissions provision, did not require a showing of materiality; and (2) there were material fact issues as to the materiality of LabCorp's alleged false statements and misrepresentations. 714 S.W.3d 677, 684, 688 (Tex. App.—Houston [1st Dist.] 2024).

We granted LabCorp's petition for review.

---

[3] The State initially alleged other misconduct, including anti-kickback violations, but it nonsuited those claims, and they are not relevant to our decision today.

## II

While no party has raised any jurisdictional concerns, we are "duty-bound to determine [our] jurisdiction regardless of whether the parties have questioned it." *In re City of Dallas*, 501 S.W.3d 71, 73 (Tex. 2016).

In recent days, Justices of this Court have identified jurisdictional concerns arising from *qui tam* actions brought under the Act. *See generally In re Novartis Pharms. Corp.*, 722 S.W.3d 720 (Tex. 2025) (statement of Young and Sullivan, JJ., respecting denial of petition for writ of mandamus). We recently considered a mandamus petition involving a civil-remedy action brought by a private relator under the Act without the State's intervention. *Id.* The defendant argued that the *qui tam* relator lacked constitutional standing because it was not injured by the alleged unlawful acts. *Id.* at 721; *see Heckman v. Williamson County*, 369 S.W.3d 137, 154 (Tex. 2012). We denied mandamus relief without resolving that argument, though two Justices wrote separately to urge that in an appropriate case, we "ought to take up this important subject." *Novartis*, 722 S.W.3d at 722 (statement of Young and Sullivan, JJ.).

Here, by contrast, the State has intervened. The State seeks to recoup a classic pocketbook injury—the loss of funds—caused by the defendant's allegedly unlawful conduct. *See Busse v. S. Tex. Indep. Sch. Dist.*, ___ S.W.3d ___, 2026 WL 1279764, at *4 (Tex. May 8, 2026) ("Indeed, we have recognized the type of pocketbook injury complained of here as a quintessential form of injury-in-fact sufficient to confer standing."). This is enough to assure us that "at least one named

15

plaintiff has standing," and so we need not consider the *qui tam* relator's standing. *Heckman*, 369 S.W.3d at 152. We may proceed to the merits.

## III

The first issue we must decide is whether Section 36.002(2) of the Act imposes liability for only *material* concealments and omissions. As its title implies, the statutory scheme concerns itself with the prevention of *fraud*, a legal term of art related to but distinct from mere dishonesty. Section 36.002(2) makes it unlawful to "knowingly conceal[ ] or fail[ ] to disclose information that permits a person to receive a benefit or payment." TEX. HUM. RES. CODE § 36.002(2). Does that language refer to *any* information at all, or only information important enough to impact the State's payment decision—information that actually matters? Text and context require us to choose the latter.

## A

### 1

We first restate the core principles that guide our analysis. As always, the statutory text controls, *City of San Antonio v. Realme*, 731 S.W.3d 342, 349-50 (Tex. 2026), and "our primary objective is to give effect to the Legislature's intent as manifested in the enacted language," *Am. Nat'l Ins. Co. v. Arce*, 672 S.W.3d 347, 354 (Tex. 2023). Critical here is the bedrock directive that statutory text "must always be read 'in context—not isolation.'" *Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 460 (Tex. 2024) (quoting *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020)). Statutory text should not be read in a vacuum. Instead, "[w]e 'give meaning to every word in a statute, harmonizing each provision', while 'consider[ing] the context and

16

framework of the entire statute', in order to 'meld its words into a cohesive reflection of legislative intent.'" *Id.* (second alteration in original) (footnote omitted) (first quoting *Hogan v. Zoanni*, 627 S.W.3d 163, 175 (Tex. 2021); and then quoting *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017)).

Those principles have special force here, where we confront a statute focused on the prevention of fraud—one of the oldest wrongs known to our law. When statutes draw from areas of law with rich common-law pedigrees, they "are to be interpreted and applied according to their common-law meanings." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 320 (describing this "age-old principle"). Courts often describe this concept with an analogy to gardening: "a common-law term . . . when transplanted into the statutory law, 'brings the old soil with it.'" *Paxton v. Am. Oversight*, 716 S.W.3d 535, 540 (Tex. 2025) (citation omitted); *see also United States v. Hansen*, 599 U.S. 762, 778 (2023) (explaining that when statutory text invokes a common-law term, the term brings the "old soil" of its common-law origins). Accordingly, a statutory reference to fraud generally must be construed "against the backdrop of common law" fraud. *Marino v. Lenoir*, 526 S.W.3d 403, 409 (Tex. 2017).

We set aside that principle only when the Legislature has clearly directed us to do so. Our precedents require "the Legislature's clear repudiation" in order to depart from a statutory term's common-law origins. *Taylor v. Tolbert*, 644 S.W.3d 637, 650 (Tex. 2022); *see also City of Houston v. Manning*, 714 S.W.3d 592, 596 n.8 (Tex. 2025) ("Abrogating common-law claims is disfavored and requires a clear

17

repugnance between the common law and statutory causes of action." (quoting *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000))); *cf.* READING LAW at 318 ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity."). That is, the text must "expressly or effectively foreclose[] the common law" before we will forgo its consideration. *Arce*, 672 S.W.3d at 355. But absent such an unmistakable signal, the duty to interpret statutory text *in context* means we must consider the text's traditional common-law origin, meaning, and application. *See Paxton*, 716 S.W.3d at 540.

The principal dissent faults our reliance on common-law principles in this context, arguing that because "[t]he common law developed to govern and guide the private economy, not to govern and guide the sovereign," it exerts little interpretive force over a statutory scheme that protects taxpayers and the State from misuse of public funds. *Post* at 2 (Blacklock, C.J., dissenting). But courts frequently rely on the common law to interpret federal statutes that implicate both private and governmental interests—including criminal statutes involving fraud against the government. As far back as 1952, for example, the U.S. Supreme Court held that criminal intent is an element of the crime of knowing conversion of government property, despite the omission of "intent" from the statutory provision. *Morissette v. United States*, 342 U.S. 246, 263 (1952). The Court reasoned that "where Congress borrows terms of art"—like "knowing"—that have "accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."

*Id.* That is no less true merely because a statute's subject matter involves the protection of public funds.

Courts have done the same in more recent times. In *Sekhar v. United States*, the U.S. Supreme Court held that attempting to compel the Comptroller Office's general counsel to recommend investment in a fund was not "extortion"—i.e., "obtaining of property from another"—under the Hobbs Act, 18 U.S.C. § 1951(b)(2). 570 U.S. 729, 731-33 (2013). In reaching this conclusion, the Court invoked the common-law understanding of extortion. *Id.* at 733. The Court explained that, at common law, the crime of extortion involved obtaining an item of value from a victim—not, as alleged against Sekhar, mere coercion to act. *Id.* at 733. Similarly, in *Neder v. United States*, the U.S. Supreme Court relied on common-law fraud principles to hold that materiality is an element of a "scheme to defraud" in the mail fraud, wire fraud, and bank fraud context. 527 U.S. 1, 20 (1999). The Court imported the "well-settled" common-law meaning of "fraud," which "required a misrepresentation or concealment of *material* fact." *Id.* at 22. And in *United States v. Hansen*, the Court held that a federal law prohibiting the "encourage[ment] or induce[ment]" of illegal immigration carries a mens rea requirement because "encourage" and "induce" bring in the old soil of common-law solicitation and facilitation, including the intent element. 599 U.S. at 778-79. Each of these cases implicated important sovereign interests, and in each, the U.S. Supreme Court construed the

19

statutory scheme according to its common-law origins. We follow the practice here.[4]

**2**

We now discuss the origins of common-law fraud that form the backdrop of the Act before concluding that no "clear repudiation" of the common law is present here.

Fraud-based claims have roots in the English common law that long predate our Nation's founding. *See* 1 WILLIAM BLACKSTONE, AN ANALYSIS OF THE LAWS OF ENGLAND 102 (5th ed. 1766). In the 18th century, Sir William Blackstone described the legal principle that deeds "must [not] be founded upon . . . fraud or collusion." 2 WILLIAM BLACKSTONE, THE COMMENTARIES ON THE LAWS OF ENGLAND 252 (4th ed. 1876). Our Nation's earliest legal scholars, including Justice Story, have described at length the common-law origins of fraud claims. 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE 213-14 (5th ed. 1849) ("Fraud . . . includes all acts, omissions, and concealments, which involve a breach of . . . duty, trust, or confidence, justly reposed, and are injurious to another.").

Early sources confirm that materiality has always been a critical component of a viable common-law fraud claim. In the 17th century, Sir

---

[4] Texas courts have done the same. *See, e.g.*, *Taylor*, 644 S.W.3d at 649-51 (holding that Texas's wiretap statute did not preclude an attorney from asserting a common-law immunity defense because the statute did not explicitly or impliedly repudiate common-law defenses); *State v. Broadmoor Austin Assocs.*, No. 15-25-00013-CV, 2026 WL 668284, at *4 (Tex. App.—15th Dist. Mar. 10, 2026, no pet. h.) (holding that the Texas Facilities Commission could not be sued for entering into a lease as the State's agent because the relevant statute did not abrogate the common-law principle that agents are not liable for a principal's contract).

Edward Coke observed that in order to be actionable, a perjurious statement must be made "in a matter material[] to the issue, or cause in question." EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 167 (1644). Similarly, Blackstone reiterated that perjury is "a crime committed when a lawful oath is administered, in some judicial proceeding, to a person who swears willfully, absolutely and falsely, in a matter material to the issue or point in question." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 77 (1769). His Commentaries emphasize the materiality component: "The perjury must also be . . . material to the question in dispute." *Id.* at 78. A century later, Oliver Wendell Holmes Jr., in his treatise *The Common Law*, explained that "a fraudulent representation must be material" in order to be actionable. OLIVER WENDELL HOLMES, THE COMMON LAW 326 (1881). He elaborated that "[i]f the belief would not naturally have had such an effect, either in general or under the known circumstances of the particular case, the fraud is immaterial." *Id.*

Ample authority from the U.S. Supreme Court and our Court agree that misrepresentations and false statements must be material in order to create an actionable fraud claim. As early as 1813, the U.S. Supreme Court explained that "[a] false representation, though no breach of the contract, *if material*, avoids the policy on the ground of fraud." *Livingston v. Md. Ins. Co.*, 11 U.S. 506, 535 (1813) (emphasis added). In its early years, this Court confirmed the same. Indeed, our earliest pronouncements define fraud with reference to "a material fact." *See Mitchell v. Zimmerman*, 4 Tex. 75, 75 (1849) ("Where a party intentionally misrepresents a material fact or produces a false

21

impression by words or acts, in order to mislead or to obtain an undue advantage, it is a case of manifest fraud."); *see also Henderson v. S.A. & Mexican Gulf R.R. Co.*, 17 Tex. 560, 561 (1856) ("If a material misrepresentation be made, although it be not embodied in the contract, it is considered a constructive or legal fraud.").

The same is true for fraud claims based on omissions. As the U.S. Supreme Court observed in recent years, "[c]ommon-law fraud has long encompassed certain misrepresentations by omission." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016). We, too, have framed fraud claims in terms of "material omissions." *E.g.*, *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990). And in discussing the elements of a claim of fraud by nondisclosure, we have emphasized that the defendant must have "deliberately failed to disclose material facts." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019).[5]

All this venerable jurisprudence led the U.S. Supreme Court to conclude in more recent times that "the common law could not have conceived of 'fraud' without proof of materiality." *Neder*, 527 U.S. at 22. The Restatement (Second) of Torts confirms the same. Section 538 of the Restatement, "Materiality of Misrepresentation"—confirms the

---

[5] *See also, e.g.*, *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) ("[T]he jury's finding of fraud can only be maintained if INA made an affirmative misrepresentation or a material omission of a fact about the investment product."); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (listing the elements of a common-law fraud claim); *Escobar*, 579 U.S. at 190 (holding that "the implied certification theory can be a basis for liability" under the False Claims Act where the failure to disclose noncompliance with "material" requirements makes representations "misleading half-truths").

common-law rule that "[r]eliance upon a fraudulent misrepresentation is not justifiable unless the matter misrepresented is material." RESTATEMENT (SECOND) OF TORTS § 538(1) (A.L.I. 1977). That materiality requirement, the Restatement explains, means that "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* § 538(2)(a). These early Restatements are evidence of "the general common law" understandings. *Kansas v. Nebraska*, 574 U.S. 445, 475 (Scalia, J., concurring in part and dissenting in part) (quoting RESTATEMENT OF CONFLICT OF LAWS, Introduction, p. viii (A.L.I. 1934)).

## B

In its efforts to combat fraud against the government, the Act—which, we remind the reader, was previously known as the Texas Medicaid *Fraud Prevention* Act, and now is called the Texas Health Care Program *Fraud Prevention* Act—taps into the rich common-law tradition discussed above. We therefore must interpret its text consistent with "the backdrop of common law," *Marino*, 526 S.W.3d at 409, unless there is a clear legislative directive otherwise, *Taylor*, 644 S.W.3d at 650. And because that backdrop includes and has always required a showing of materiality, we must conclude that absent legislative repudiation, Section 36.002(2) requires the government or relator to prove that an omission was material.[6]

---

[6] In objecting to our approach, the principal dissent appears to place significant weight on its observation that Section 36.002(2) never uses the word "fraud." *Post* at 10 (Blacklock, C.J., dissenting). But the substance of the statutory scheme unmistakably addresses fraud against the government; as we said in *Xerox*, it "target[s] fraud." 555 S.W.3d at 525. As such, it is simply

In arguing that Section 36.002(2) rejects a materiality requirement, the State makes two principal textual arguments. Neither persuades us.

**1**

First, the State notes that nothing in Section 36.002(2) expressly references materiality. But silence is not repudiation. We cannot "infer from the absence of an express reference to materiality" that the Legislature "intended to drop that element from" fraud claims brought under the Act. *Neder*, 527 U.S. at 23; *Taylor*, 644 S.W.3d at 650. More is required to repudiate the centuries-old principle that fraud claims carry a materiality requirement. *See Neder*, 527 U.S. at 23.

Moreover, the Legislature's reliance on the verb "permits" suggests the Legislature did not disclaim a materiality requirement. Under Section 36.002(2), a concealment or failure to disclose information is only actionable if it "permits" an improper payment. *See* TEX. HUM. RES. CODE § 36.002(2). That phrasing typically denotes the concepts of "giv[ing] opportunity for" or "allow[ing]." *See Permit*, BLACK'S LAW DICTIONARY (7th ed. 1999); *Permit*, OXFORD ENGLISH DICTIONARY

Texas's version of the same type of fraud-prevention statute ubiquitous among other States and the federal government, as the statutory title indicates. We respectfully disagree with our dissenting colleagues' view that the Legislature twice decided to use "fraud prevention" in Chapter 36's title as a mere "promotional political slogan." *Post* at 10 (Blacklock, C.J., dissenting). Our Legislature itself has declared, in the Code Construction Act, that "[i]n construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the . . . title." TEX. GOV'T CODE § 311.023(7). And it is long settled that "[t]he title and headings are permissible indicators of meaning." READING LAW at 221.

24

(2d ed. 1989). Inherent in the concept that *A* "permits" *B* is the suggestion that *A* must carry some importance—or else it would not "allow" *B* or create an "opportunity" for *B* to occur. *See id.* As a matter of common usage, we struggle to see how an *immaterial* omission would be understood to "permit" an improper payment.

2

The State and the principal dissent next argue that because other parts of Section 36.002 expressly reference materiality, Section 36.002(2)'s failure to do the same must imply the Legislature rejected a materiality requirement for omissions. *See* TEX. HUM. RES. CODE § 36.002(1), (4), (12). This argument has some force because, as a general matter, when a statute uses a particular term in one provision, its absence from another provision often (but not always) creates a negative inference. *E.g.*, *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 564 (Tex. 2016); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("[W]e believe every word excluded from a statute must also be presumed to have been excluded for a purpose."). But this interpretive principle is not an inexorable rule, and for multiple reasons, it does not carry the day here.

First, the principle is strongest when the two provisions are otherwise identical, so as to make the omission conspicuous. *See, e.g.*, *Ineos USA*, 505 S.W.3d at 564 (applying presumption when the first statutory list included "a property owner, contractor, or subcontractor" and the second included "an owner, a contractor, or a subcontractor *or an employee* of a contractor or subcontractor" (emphasis added)). Such parallelism is lacking here. Paragraph (1) describes "a false statement

25

or misrepresentation of a *material fact*," TEX. HUM. RES. CODE § 36.002(1) (emphasis added), and Paragraph (4) is nearly identical, *see id.* § 36.002(4). Paragraph (2), by contrast, uses a different and more abstract structure: "knowingly conceals or fails to disclose information." *Id.* § 36.002(2). So does Paragraph (12): "a false record or statement material to an obligation." *Id.* § 36.002(12). If Paragraph (2) were structured identically to a neighbor but for the missing word "material"—e.g., "knowingly conceals or fails to disclose *a fact*"—the negative inference would be stronger. *See Ineos USA*, 505 S.W.3d at 564. But as we find the statute, the syntactical differences do not convince us that the Legislature clearly repudiated the common-law materiality requirement for omissions.

Moreover, our duty to "harmoniz[e]" Paragraph (2) with its statutory neighbors strongly counsels in favor of finding a materiality requirement. *Luminant*, 691 S.W.3d at 460; READING LAW at 167 (discussing the "whole-text canon"), 180 (discussing the "harmonious-reading canon"). The State's view would require us to accept that the Legislature treated an affirmative but immaterial lie more leniently than an equally immaterial omission. That is implausible. The statute, after all, exists to "target[] fraud against the Texas Medicaid program," *Xerox Corp.*, 555 S.W.3d at 525, and it would make little sense to conclude, based on nothing more than a negative inference, that the Legislature sought to condemn omissions more strenuously than falsehoods.

On top of that, the ease with which an omission can be recast as a misrepresentation—and vice versa—strongly suggests they should be

treated alike. The Definitions section of Administrative Code Chapter 371 admits as much. It defines "[f]alse statement or misrepresentation" as, among other things, "[a]ny statement or representation that is . . . incomplete." 1 TEX. ADMIN. CODE § 371.1(27). In other words, an omission *is a misrepresentation*. The Provider Agreement proclaims much the same: "Provider understands that falsifying entries, *concealment of a material fact*, or *pertinent omissions* may constitute fraud and may be prosecuted under applicable federal and state law." (Emphases added.). Under these circumstances, it is implausible that the Legislature would treat omissions and misrepresentations as differently as the State claims. And it is notable that the Agreement insists that only "pertinent"—i.e., material— omissions are unlawful.

We thus find little force in the State's insistence in its briefing that the categories are demarcated clearly and distinguished easily. All of the alleged unlawful acts here—LabCorp's false statements, misrepresentations, and omissions—are bound up in the same underlying conduct. For example, the State alleges that LabCorp made misrepresentations by certifying it would comply with the law *and* unlawful omissions by failing to disclose its unlawful conduct. The State does not explain what meaningful difference separates the two.

Finally, for the reasons noted above, the verb "permits" naturally bakes in some component of materiality. This substantially downgrades

27

any interpretive force that may have come from the Legislature's failure to include the word "material" in Paragraph (2).[7]

**\* \* \***

For the above reasons, properly interpreting statutory text and context against the backdrop of the common law, we conclude that Section 36.002(2) requires a showing of materiality. A plaintiff bringing a suit under the Act must demonstrate that a "conceal[ment] or fail[ure] to disclose information" mattered to the State's payment decision in order for its Section 36.002(2) claim to be actionable. TEX. HUM. RES. CODE § 36.002(2). Because the court of appeals concluded the opposite, we must reverse its judgment.

**IV**

We next decide whether the trial court correctly granted LabCorp summary judgment by concluding that any false statements, misrepresentations, or omissions were immaterial as a matter of law. The Act defines "[m]aterial" as "having a natural tendency to influence or to be capable of influencing," *id.* § 36.001(5-a), and we have previously explained that "[a] representation is material if the representation was important to the plaintiff in making a decision, such that a reasonable person would be induced to act on and attach importance to the representation in making the decision." *Barrow-Shaver Res. Co. v.*

_____

[7] The U.S. Supreme Court's interpretation of the analogous federal False Claims Act further supports our view. In *Escobar*—which we discuss further below—the Court observed that Section 3729(a)(1)(A) of the False Claims Act requires materiality, despite that subsection's omission of "material" and the inclusion of the term elsewhere in Section 3729. 579 U.S. at 193 (citing 31 U.S.C. § 3729).

*Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019); *see also Escobar*, 579 U.S. at 193 ("Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" (alteration in original) (quoting 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003))).

On this record, we conclude that LabCorp's alleged false statements, misrepresentations, and omissions were not material.[8]

## A

We first must assess how this type of claim fits with the summary-judgment standard.

### 1

LabCorp sought traditional summary judgment and thereby took on a burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a.

---

[8] Aside from a passing comment by the State, the parties have not briefed whether the materiality requirement, properly understood, incorporates an objective or subjective standard. We dispense with an extensive discussion on that question today, because it is unnecessary to the resolution of this case: LabCorp is entitled to judgment under either formulation. For its part, the principal dissent would adopt a "subjective causation" standard. *Post* at 9 (Blacklock, C.J., dissenting). In our view, though, the definition of "material"—that is, "having a natural tendency to influence or be capable of influencing"—uses language that typically implicates an objective inquiry. It asks about the inherent *capacity* of the information, not whether it happened to register with a particular official on a particular day. Still, we note that in the False Claims Act context, at least one federal appellate court has adopted a "holistic" approach blending subjective and objective considerations. *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541 (10th Cir. 2020). In the absence of adversarial presentation, we reserve further analysis on this issue for another day following appropriate percolation in the lower courts.

We have long held that a "defendant as movant must disprove at least one of the essential elements of the plaintiff's causes of action to prevail on summary judgment." *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999). We have framed this as a requirement to "conclusively negate[ ]" one element of the claim. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *see Renaissance Med. Found. v. Lugo*, 719 S.W.3d 505, 517 n.19 (Tex. 2025) (noting that "it was the [defendant's] burden to conclusively disprove an essential element of" the plaintiff's claim in its motion for summary judgment); *cf. Draughon v. Johnson*, 631 S.W.3d 81, 87 (Tex. 2021) (discussing the conclusively-negate standard in the context of affirmative defenses). A defendant's showing is "conclusive only if reasonable people could not differ in their conclusions." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

When mapped onto the Act, this standard poses a conceptual challenge. Section 36.002 requires a showing of materiality, and LabCorp therefore must show that its alleged unlawful acts—false statements, misrepresentations, and omissions regarding its compliance with the law—were immaterial to the State's payment decisions. But how can one conclusively establish that alleged actions and inactions were *not* material? Courts have always recognized the inherent difficulty in proving a negative. *E.g., State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970) (mentioning "[t]he difficulty in proving a negative"); *20801, Inc. v. Parker*, 249 S.W.3d 392, 397 (Tex. 2008) ("As a practical matter, proving a negative is always difficult and frequently impossible."). The task is all the more daunting here, where

"materiality" is itself an abstract concept, generally inferred from circumstantial conduct.

At the same time, there must be *some* way a defendant can conclusively establish that the alleged unlawful acts did not have a natural tendency to influence the State's payment decisions. We hold today that the defendant can do so by offering competent evidence of undisputed facts that, when viewed as a whole, are incompatible with materiality. *Cf.* TEX. HUM. RES. CODE § 36.001(5-a) (defining "material" as "having a natural tendency to influence or to be capable of influencing").

When the defendant does so, the burden then "shifts to the non-movant"—here, the State—to present evidence "disprov[ing] or rais[ing] an issue of fact as to at least one of" the elements of the claim or defense on which the movant seeks judgment: here, the materiality of the unlawful acts. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014); *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). The State (or *qui tam* relator) must create a fact issue with *evidence*, not arguments, sufficient to permit a reasonable factfinder to conclude that the alleged unlawful acts had a natural tendency to influence the State's payment decision. TEX. HUM. RES. CODE § 36.001(5-a); *see Draughon*, 631 S.W.3d at 87; *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016).

**2**

Our Court has not had occasion to elaborate on the types of evidence that bear on this analysis, but we find substantial guidance in

31

our common-law precedents and our federal colleagues' approach to the substantially similar materiality standard in the False Claims Act.

One time-honored principle of fraud holds that a party may "deprive himself of all right to relief" if he knows of allegedly fraudulent conduct yet continues to deal with the other party. STORY, *supra*, at 230; *see id.* at 230-31 (explaining that a party may "lose all title to legal and equitable relief" if "he knew all the facts, and with such full information he continued to deal with the party"). This is because if a party knows a representation is false, "it cannot be said to influence his conduct." *Id.* at 230. We believe that principle informs Section 36.002's materiality analysis.

So too does the federal courts' approach to the False Claims Act, which defines "material" much the same as the Act: "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). We of course should not invoke federal precedent to interpret Texas statutes without first confirming that the underlying text is sufficiently analogous. *See Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Flores*, 709 S.W.3d 500, 511-12 (Tex. 2024) (Blacklock, J., concurring). And we noted in *Xerox* that the Act, the federal FCA, and other "analogous federal and state fraud-prevention acts," "while similar in aim and tactic, employ materially different language." 555 S.W.3d at 535. However, when it comes to defining *materiality*, the Act and the FCA statutory regimes bear sufficient similarity to render federal caselaw on the FCA's materiality requirement persuasive.

In *Escobar*, the U.S. Supreme Court considered how courts should "evaluat[e] materiality under" the FCA. 579 U.S. at 194-95. In its unanimous decision, the Court observed that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 195; *see also D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that [the government] has not denied reimbursement for [the device] in the wake of [the relator's] allegations casts serious doubt on the materiality of the fraudulent representations that [the relator] alleges."). Likewise, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195. And the Court emphatically rejected the "view of materiality" pressed by the federal government whereby "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* The Court explained that "[t]he False Claims Act does not adopt such an extraordinarily expansive view of liability." *Id.* at 196. Neither does the Act.[9]

---

[9] Other federal authority fleshes out *Escobar*'s insights and provides further guidance on the materiality inquiry. *See, e.g., Janssen*, 949 F.3d at 542; *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 388 (5th Cir. 2017); *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1033-34 (D.C. Cir. 2017); *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 764-65 (3d Cir. 2017); *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 664-65 (5th Cir. 2017). The Fifth Circuit's approach in *Harman* is

Drawing on that analysis, our own caselaw, and the background common-law fraud principles discussed above, we see several categories of evidence that a defendant might marshal to negate materiality. The first, and most critical, involves what the government knew and how it acted in light of that knowledge. We agree with *Escobar*: the government's continued payment despite its actual or imputed knowledge of a violation is at least "very strong evidence" of immateriality, and in some cases may be conclusive. *Id.* at 195. The evidence in this category would include proof that the defendant disclosed its practices to the government; that the government had access to the relevant data; and that the government continued paying claims, renewing contracts, and maintaining the defendant's enrollment in the program. The longer the period of knowing payment and the more complete the government's knowledge, the stronger the inference of immateriality.

Relatedly, the authority of the state officials made aware of the potential wrongdoing may bear on the materiality analysis. If the defendant has disclosed the potential regulatory violation to low-level government employees, who exert no meaningful control over policy or enforcement, and who in turn take no action, the inference of immateriality is weaker. But when the defendant's actions are made

---

especially illustrative. That decision reversed a jury verdict and granted judgment as a matter of law to the defendant on materiality grounds, where "the 'very strong evidence' . . . of [the government's] continued payment remain[ed] unrebutted." 872 F.3d at 665-70. As the Fifth Circuit noted, "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Id.* at 663.

known to senior officials and other decisionmakers, their response is more probative of materiality. *See Harman*, 872 F.3d at 665 (recognizing "that the decision to continue approving and purchasing the product was not made by a low-level bureaucrat, but rather by [the agency] itself, and thus has special force").

Another evidentiary category may be the government's treatment of similar violations by other providers. Again, we agree with *Escobar*: whether the government "consistently refuses to pay claims" based on similar noncompliance or instead "regularly pays" them informs materiality. 579 U.S. at 195. If the State has a pattern of paying claims from other providers who engage in the same practices, that suggests the requirement at issue is immaterial to payment decisions. *See id.*

Other relevant considerations include whether the requirement was a formal condition of payment, or merely a general regulatory obligation. Violations of the former are more likely material; violations of the latter are less so. *See id.* at 194. Was the violation substantial or minor? Noncompliance that goes to the very essence of the bargain is more likely material than "minor or insubstantial" noncompliance. *Id.* And violations of a statute duly ratified by elected officials in the Texas Legislature are more likely material than noncompliance with one of thousands of ambiguous administrative pronouncements promulgated by regulatory agencies.[10]

---

[10] Still other considerations may be relevant, and we do not purport today to document them all. We trust that litigants and the lower courts, drawing from our discussion in this opinion and the authorities we cite, will appropriately assess other proper considerations in future cases.

Guided by these principles, we turn now to the record. We first conclude that LabCorp offered sufficient evidence that the State's conduct was incompatible with materiality. We then conclude that the State did not offer sufficient evidence to create a fact issue.

**B**

The crux of LabCorp's summary-judgment motion is that the State knew the relevant aspects of LabCorp's billing practices in 2014, yet continued to pay LabCorp's claims without objection for seven years. According to LabCorp, the State's conduct over this extended period demonstrates that any alleged false statements, misrepresentations, and omissions regarding LabCorp's legal compliance were not material to the State's payment decisions.

To support that argument, LabCorp offered several categories of competent summary-judgment evidence. First, it provided two declarations from LabCorp employees that further explained LabCorp's billing practices; confirmed that the State did not deny a claim on any basis related to the billing regulations, including the "discount" requirement; and confirmed that billing data produced to the State reflects that United HealthCare "paid lower rates in certain circumstances for a [LabCorp] test than the retail price" charged to Medicaid. LabCorp further submitted the slide deck that formed the basis of its discussion with OAG decisionmakers in 2014, and the 2015 white paper elaborating on that discussion, both of which we discussed in detail above. *See supra* Part I.B. LabCorp also provided the trial court with the State's Objections and Responses to LabCorp's Requests for

36

Admission and Interrogatories, which reference, among other things, the billing data that LabCorp produced to the State in 2014.

The slide deck and white paper discuss LabCorp's billing practices in detail and highlight the exact practices that, seven years later, would form the basis of the State's fraud claim. To summarize the above discussion: In 2014, the State knew that LabCorp maintains a two-tier pricing structure; that LabCorp bills all third-party payors (including Medicaid) the same Patient Fee Schedule rate; that LabCorp accepts lower payments from private insurers through negotiated arrangements; and that LabCorp does not consider these arrangements to be "discounts" within the meaning of the billing regulations because the State's own guidance suggests the "discount" rules are focused only on "advertised" rates available to "the general public." That information was presented to OAG decisionmakers, including the then-Deputy Chief of OAG's Civil Medicaid Fraud Division. LabCorp further established with competent (and undisputed) evidence that the State continued to pay each of LabCorp's claims for years without objection.

As this evidence shows, the alleged infractions here turn not on the purported violation of a statute enacted by the Legislature, but on noncompliance with administrative billing regulations that address "usual and customary fees" and "discounted" charges without defining those terms. Invoking the Manual's and Agreement's guidance, LabCorp argues that these regulations speak to rates "advertised to the public" or "promotional offers provided to the general public." LabCorp asserts, and the State does not dispute, that it *bills* all third-party payors the same usual and customary fees; any differential comes on the back end,

when LabCorp *accepts* lower payments in certain cases that it does not "advertise" and that are not available "to the general public." Assuming this conduct violates the billing regulations would mean that anytime a provider agrees—in the name of charity—to accept a lower payment from an indigent uninsured customer, that provider is forevermore locked into that one-off charity rate for millions of Medicaid claims. If that view is the law, the State could have said so long ago. Echoing *Escobar*, we believe that the alleged violation of unclear general administrative regulations, left unchallenged for many years, casts substantial doubt on materiality. 579 U.S. at 195-96.

Viewing this evidence as a whole, LabCorp carried its initial summary-judgment burden of conclusively establishing that its alleged unlawful acts did not have a "tendency to influence or to be capable of influencing" the State's payment decision. TEX. HUM. RES. CODE § 36.001(5-a).

## C

We turn now to the State's burden "to present evidence "disprov[ing] or rais[ing] an issue of fact as to at least one of" the elements of the claim or defense on which LabCorp seeks judgment: materiality. *Amedisys, Inc.*, 437 S.W.3d at 511. As we read the record, the State's summary-judgment showing consisted of several forms of evidence and related arguments. We discuss each.

*First*, in its summary-judgment motion and in this Court, the State argues that LabCorp's disclosures do not negate materiality because LabCorp did not expressly confess in the 2014 presentation and 2015 white paper that it was violating Texas law. We disagree. LabCorp

38

told the State of its practices, explained its view that its practices were lawful under the best reading of the applicable regulations, and opened its relevant records to the State's inspection. *See supra* Part I.B. LabCorp bemoaned to OAG decisionmakers that the billing regulations are "not a model of clarity," and it put forward a good-faith and plainly plausible interpretation of those regulations. As we read the record, the State was made aware of the critical conduct it now claims is illegal, including violations of the regulations governing usual and customary charges, best pricing, and discounts. It is conduct that matters, not the legal conclusion a party attaches to it.

*Second*, and relatedly, the State argues that LabCorp never fully disclosed the *extent* of its allegedly unlawful conduct. The State acknowledges the evidence LabCorp proffered, but suggests it did not actually put the State on notice of all of LabCorp's alleged regulatory violations. The State dismisses LabCorp's disclosures as "deliberately muddy" and claims that nothing LabCorp provided allowed the State to determine whether LabCorp actually complied with the billing regulations.

But the State does not meaningfully dispute that it knew about LabCorp's two-tier pricing system and that LabCorp accepts lower payments from some payors pursuant to various considerations, including contractual obligations. Nor could it: LabCorp expressly said as much in the 2014 presentation and the 2015 white paper. That the State did not know *which* private insurers remitted individualized payments does not matter. The State's core theory of liability turns on the same practices LabCorp disclosed. The State did not deny a claim on

the basis of fraud, nor express any complaint regarding those practices. These facts are incompatible with materiality.

Notably, the State does not base its materiality theory on the dollar value of the alleged wrongdoing. This is not a case where the State knew of violations of the billing regulations but reasonably believed they were *de minimis*, only to later uncover the full extent of wrongdoing and realize with surprise that its financial losses were substantial. The magnitude of a violation is certainly a proper consideration in the materiality analysis. *See Escobar*, 579 U.S. at 194. Here, while the State may not have known the full details of which payments LabCorp accepted from which payors, nothing in the record suggests the State reasonably believed that the practices it now labels unlawful carried insignificant monetary value.

*Third*, the State highlights in this Court that compliance with the billing regulations is a condition of payment. Similarly, it argued at summary judgment that as a matter of law, because noncompliance with the Provider Agreement is a basis to deny a claim, LabCorp's violations are necessarily material. The U.S. Supreme Court rejected that exact argument in connection with the federal FCA's materiality requirement, and we do the same here. *Escobar*, 579 U.S. at 181. In *Escobar*, the federal government urged, just as the State does here, that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 195. Yet the unanimous U.S. Supreme Court explained that "even when a requirement is expressly designated a condition of payment, not every violation of such

40

a requirement gives rise to liability." *Id*. at 181. We agree. The Act "does not adopt such an extraordinarily expansive view of liability." *Id*. at 196.

*Fourth*, the State's summary-judgment motion wrongly conflates evidence of a violation with evidence of materiality. For example, the State's summary-judgment evidence includes LabCorp's Facility Participation Agreement with United HealthCare, and other evidence showing that LabCorp offered "fee-matching" to a former LabCorp account. But evidence of an alleged regulatory violation is not evidence of materiality. As discussed further below, it neither creates a fact issue as to LabCorp's awareness of the purportedly unlawful conduct, nor explains why the State continued to pay LabCorp's claims. Likewise, the State's summary-judgment evidence about a different State's settlement with LabCorp and various proposed amendments to federal law do not bear on whether these alleged unlawful acts mattered to the State.

*Finally*, we emphasize what the State did *not* show. The State's summary-judgment evidence does not explain why the State continued to pay LabCorp's claims, if not because the alleged unlawful acts were immaterial. For example, the evidence does not show the State continued paying because it was concerned about disruption of patient care. And the evidence does not point to any enforcement action by the State or any disapproval of LabCorp's billing practices after it conducted its investigations. Finally, to the extent the State falls back on arguments about the "muddy" nature of LabCorp's disclosures, such "arguments are not evidence," *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 208 (Tex. 2021), and cannot create a fact issue precluding summary judgment. *See Walker*, 924 S.W.2d at 377 ("After the defendant produces

41

evidence entitling it to summary judgment, the burden shifts to the plaintiff to *present evidence* creating a fact issue." (emphasis added)).[11]

## D

Before concluding, we pause to offer some words of caution about today's decision.

First, we do not hold—in fact, we expressly disclaim—that anytime the State becomes aware of a potential regulatory violation, it must immediately cease payment, or else forevermore forfeit a claim under the Act. To the contrary, the Administrative Code allows the State to continue payment while disapproving of the practice at issue by levying any of many administrative enforcement actions, including "prepayment review of all claims or certain specific claims," 1 TEX. ADMIN. CODE § 371.1701(c)(4), "requiring submission of additional documentation or justification for a claim . . . as a condition precedent to payment of the claim," *id.* § 371.1701(c)(7), or "post-payment review of all claims or certain specific claims or services of a person after payment," *id.* § 371.1701(c)(5). Other remedies include transferring the company to a probationary contract, *id.* § 371.1701(c)(1), or a requirement for prior authorization of certain services, *id.* § 371.1701(c)(3). Still other prepayment and postpayment remedies may be available, and we do not purport to document them all. *See generally*

---

[11] The State argues that a second CID it issued to LabCorp in 2018 reflects suspicions about the lawfulness of LabCorp's conduct. In the abstract, the government's decision to ask for information may inform the materiality of the underlying subject matter. But on this record, follow-up requests for more details do not overcome the undisputed evidence that the State knew in 2014 about what it now calls obvious regulatory violations and offered no objection until 2021.

*id.* § 371.1701. We merely note that in true cases of material misconduct, we are confident that the State has ample tools to protect its interests, alert the offending party, and preserve its ability to seek redress under the Act and other statutory schemes.

We likewise emphasize that the State is entitled to a reasonable time to investigate suspected potential regulatory violations. As a federal court has observed as to the False Claims Act, "[t]he Government must be given time to investigate and determine whether the accusations have merit and whether to intervene in the action." *United States ex rel. Longo v. Wheeling Hosp., Inc.*, No. 5:19-CV-192, 2019 WL 4478843, at *7 (N.D. W. Va. Sept. 18, 2019). The same is true here—but the State must perform any investigation with diligence, and it must make regulated parties aware of its concerns. At some point, following extended government inaction, there must come a time when a court necessarily concludes that the alleged misconduct at issue is not material. *Cf. Escobar*, 579 U.S. at 195.

Finally, nothing in our opinion today should be misconstrued to suggest that estoppel runs against the government in this context. *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835 (Tex. 1970) ("[W]hen a unit of government is exercising its governmental powers, it is not subject to estoppel."). And we agree with our dissenting colleagues that "HHSC employees do not have the power to authorize LabCorp to overcharge the State of Texas." *Post* at 4 (Blacklock, C.J., dissenting). Nothing in our decision today constrains the State's ability to enforce actual regulatory violations going forward.

## V

For the foregoing reasons, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

Kyle D. Hawkins
Justice

**OPINION DELIVERED:** June 19, 2026